**S. STROCK & COMPANY, Inc.**

v.

**SOUTHERN PACIFIC COMPANY.**

Civ. A. No. 68–635.

United States District Court,
D. Massachusetts.

May 5, 1971.

Frank Infelise, Lynn, Mass., for plaintiff.

· George B. Redding, James B. Winward, Boston, Mass., for defendant.

## OPINION

FRANCIS J. W. FORD, District Judge.

This is an action under 49 U.S.C. § 20(11) to recover for damages to a shipment of cantaloupes, sold to plaintiff by

Pilibos Sales, Inc., of Mendota, California, and shipped from Mendota via the lines of defendant for delivery in Boston.

The cantaloupes were loaded on a refrigerator car at Mendota on August 8, 1962. The shipment was inspected and a certificate of inspection issued by the United States Department of Agriculture. The time of completion of this inspection was 7:00 p.m. on August eighth. The certificate indicates that the inspector found the cantaloupes mature, of good internal quality, mostly firm, many hard, well netted, with no decay and with defects within tolerance. The car was delivered to the carrier on August ninth at 10:00 p.m. There was evidence that plaintiff had ordered precooling of the shipment after loading, but no evidence as to whether this had actually been carried out or not. In fact, there was no evidence as to what was actually done with the car in the twenty-seven (27) hours between completion of the inspection and delivery to the carrier.

The record of the refrigeration service on the car indicates that a total of twelve thousand five hundred (12,500) pounds of ice was supplied to the car between August fourth and August seventh, before the loading took place. During transit ice was added in the amount of eighty-six hundred (8,600) pounds on August tenth, three thousand (3,000) pounds on August eleventh, six thousand (6,000) pounds on August twelfth, thirty-two hundred (3,200) pounds on August fourteenth, twenty-eight hundred (2,800) pounds on August fifteenth, and five thousand (5,000) pounds on August sixteenth.

The car was delivered to plaintiff at Boston on August 16, 1962. An inspection by the Railroad Perishable Inspection Agency made at 8:05 a.m. on that day indicated that the load had moved in the car one (1) inch at the floor to four (4) inches in the top layer, with no visible damaged boxes. There was three per cent (3%) pack bruising and an average seven per cent (7%) soft rot decay, all stages.

▪ In an action to recover from the defendant carrier for damages to the shipment, plaintiff must, in order to establish a prima facie case, show delivery to the carrier in good condition, arrival in damaged condition and the amount of damages. Missouri Pacific R.R. Co. v. Elmore and Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194. As to what is good condition on delivery to the carrier, both parties appear to agree that this means "suitable shipping conditions", which is defined as follows:

"(j) 'Suitable shipping condition', in relation to direct shipments, means that the commodity, at time of billing, is in a condition which, if the shipment is handled under normal transportation service and conditions, will assure delivery without abnormal deterioration at the contract destination agreed upon between the parties." 7 C.F.R. § 46.43(j).

Plaintiff contends that it has sustained its burden of showing delivery to the carrier in good condition by putting in evidence the August eighth inspection certificate. Defendant contends that this certificate is irrelevant and of no evidentiary value at all since twenty-seven (27) hours elapsed between the inspection and delivery to the carrier.

▪ The inspection certificate of the Department of Agriculture is not in itself conclusive proof that the commodity was in good condition on delivery. It is only prima facie evidence of the truth of the statements contained therein, that is, the facts observed and noted by the inspector at the time of the inspection. 7 U.S.C. §§ 499n and 1622(h). It may be in itself sufficient to warrant a finding of good condition at the time of shipment, but it does not compel it, particularly when there is other evidence from which a different conclusion may be drawn. Of course, as a practical matter, a shipper cannot usually procure a certificate of an inspection at the exact moment of delivery. This court will

not rule that twenty-seven hours or any other definite period of time elapsing between inspection and delivery as a matter of law renders the inspection certificate so remote as to be inadmissible. Nevertheless, the length of time between inspection and delivery must be considered in determining the evidentiary weight to be given to the certificate.

In this case there is other evidence from which an inference may be drawn as to the condition of the cantaloupes at the time of delivery to the carrier. On arrival in Boston, the cantaloupes showed seven per cent soft rot decay. No decay had been noted at the time of loading. Soft rot decay is caused by a fungus naturally present in the cantaloupes. As indicated by the testimony of experts at the trial, it will develop when the temperature of the cantaloupes goes above 40° to 45° F., and proceeds most rapidly when they are at a temperature of about 70° F.

In the opinion of Professor Massey, an expert called by defendant, to prevent the growth of the fungus during transit, the temperature of the cantaloupes should be lowered to at least 45° F. before loading or at least within twenty-four (24) hours thereafter.

There was evidence that the cantaloupes had been subjected to a process of hydrocooling before loading. In the opinion of another expert witness, McKee, this process, involving subjecting the cantaloupes to a twenty-minute bath in water at 36° F., would at most lower the surface temperature of the melons to a little above 60° F.

McKee also testified as to his calculations as to the actual temperature of the cantaloupes in the car, based on the amount of melting of the ice as shown from the amount of ice added at icing points along the route. By this method, he calculated that from the amount of ice added on August tenth, eleventh, and twelfth, the commodity temperature at the time of loading was 80° F., that it was reduced to 67° by August tenth and to 60° by August eleventh.

On this evidence, the Court finds that the cantaloupes were not sufficiently cooled at the time of delivery to prevent the natural development of soft rot fungus, and hence were not at the time of shipment in a condition to assure against deterioration under normal transportation conditions. The Court finds that plaintiff has failed to sustain its burden of proving delivery to the carrier in good condition, but rather that the damaged condition of the cantaloupes upon delivery to plaintiff in Boston was due to failure to cool them sufficiently before shipment to inhibit the natural tendency to decay.

Judgment will be entered for defendant.